OIL TRANSFER CORPORATION, as owner of M/V Otco New York, Libellant,

v.

DIESEL TANKER F. A. VERDON, INC., and THE M/V F. A. VERDON, Claimant-Respondent.

DIESEL TANKER F. A. VERDON, INC., owner of M/V F. A. Verdon, Libellant,

v.

THE M/V OTCO NEW YORK and Oil Transfer Corporation, Claimant-Respondent.

United States District Court
S. D. New York.
Jan. 11, 1960.

Macklin, Speer, Hanan & McKernan, by John C. Hart, New York City, for Oil Transfer Corp.

Foley & Martin, by John Hanrahan, Jr., and John F. Quarto, New York City, for Diesel Tanker F. A. Verdon, Inc.

EDELSTEIN, District Judge.

These cross libels resulted from a collision between the motor vessel Otco New York and the motor vessel F. A. Verdon, in the New Haven Harbor Channel on the morning of April 15, 1955. The Oil Transfer Corporation, owner of the Otco New York, and the Diesel Tanker F. A. Verdon, Inc., owner of the F. A. Verdon, were and are corporations organized and existing under the laws of the State of New York. The Otco New York is a motor vessel of 1,913 gross tons, 1,388 net tons, 278 feet in length, 43 feet in breadth, 19.6 feet in depth and has 1,150 horsepower. It is a twin engine, twin screw and twin rudder vessel. The F. A. Verdon is a motor vessel of 768 gross tons, 654 net tons, 204.5 feet in length, 31.6 feet in breadth, 12.8 feet in depth and has 450 horsepower. At the time of the institution of the suits, both vessels were within the Southern District of New York and the jurisdiction of this court.

The Verdon, laden with a cargo of gasoline, was en route from Carteret, New Jersey, to West Haven, Connecticut. Visibility conditions were limited and a dense fog shut in by the time the vessel passed inside the breakwater into New Haven Harbor Channel. The Otco New York had been berthed at the Monsanto Pier in New Haven and was ready for sea at 0400 of April 15, but did not depart because of dense fog. At 0615 the visibility cleared somewhat and she departed her berth. At 0640, in very light ballast, she cleared the pier and headed downstream on approximately a southern course with a favoring ebb tide of about one knot, the current being approximately the strength of the ebb tide, and with practically no wind. As she backed away from the pier and straightened out in the channel swinging to starboard, the fog closed in again, "real thick". The cap-tain was stationed in the wheelhouse with the chief mate, who was pilot, and a helmsman and a lookout was stationed in the bow. On the Verdon, the captain was on watch with a deckhand at the wheel and the second mate, who was not officially on watch, "watching the radar and helping around there". There was no lookout on the bow of the Verdon, which was 180 feet forward of her pilot house, the captain relying upon his radar. The Otco New York was also equipped with radar but her captain was confused by it and could not "make head or tails of it" at the times in question. The New Haven Channel runs approximately north and south, ranging in width from 400 feet to 500 feet and is bounded and marked on each side by buoys. Each vessel claims to have proceeded on her own starboard side of the channel. Each sounded the regulation fog signals. While proceeding up the channel, the Verdon's master and mate claimed to have observed, on radar, a vessel which subsequently proved to be the Otco New York, bearing dead ahead. The Verdon's engine was immediately stopped, a fog signal was sounded, her engine was put full speed astern and three blasts were sounded on the whistle to indicate backing. According to the captain's estimate, from one to three minutes later the Octo New York was sighted visually, approaching through the fog, and within seconds was in collision with the Verdon which was either dead in the water or making some sternway. The Otco New York drove her stem into the starboard bow of the Verdon, penetrating a distance of six or seven feet. The Otco New York had been proceeding south, and when her captain heard the fog signal from the Verdon he stopped her engines, and after ascertaining that the signal had been heard from forward of the beam, he proceeded ahead at different speeds and not just under a slow bell. Shortly after passing buoy 11, at which the Otco New York had eased to the right, she heard a long signal and the three blast signal, and observed the foremast of a vessel on her port bow on a crossing course. She went full astern

on her two engines, and about 15 seconds later, at approximately 0657, the collision occurred.

There can be no doubt that the Verdon was in violation of Article 29 of the Inland Rules of the Road, 33 U.S.C. A. § 221, in her failure to have a lookout. It is not merely a question of a failure to have a bow lookout, see United States v. The Adrastus, 2 Cir., 190 F.2d 883, 886, but a failure to have any lookout whatever. The captain was conning the ship and operating the radar, the mate was helping out generally and also observing the radar, and the helmsman, of course, was steering. None of these was so free of other duties as to qualify as a "free and single-minded lookout." The Koyei Maru, 9 Cir., 96 F.2d 652, 654; The Knoxville City, 9 Cir., 112 F.2d 223, 226. A lookout should have no other duties. The Genesee Chief, 12 How. 443, 462, 13 L.Ed. 1058; Chamberlain v. Ward, 21 How. 548, 571, 16 L.Ed. 211; Griffin on Collision, sec. 109. "It is not safe to depend on the pilot or others on the bridge, who are charged with various important duties and responsibilities." United States v. Holland, D.C., 151 F. Supp. 772, 777 and authorities there cited. It is argued that the absence of a lookout was immaterial, under the rule of The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148, because the fault was not a cause of collision and could not have been such a cause. But the argument fails. If visibility was better from the bridge than from the bow (a fact I do not. find to have been established), that fact might have excused the posting of a lookout on the bow; even this conclusion is doubtful in view of the fact that the visibility reported by the Verdon was less than 100 feet and the pilothouse of the Verdon is 160 feet from her bow. But there was no lookout on the bridge either. Reliance was placed exclusively on radar. The captain said he did not look all about. "Nothing to look all about. When there is foggy weather the only thing you can see is the radar". But "[r]adar is an aid, not a substitute, for prudent seamanship * * *", Wood v.

United States, D.C., 125 F.Supp. 42, 51; Pocahontas Steamship Co. v. The Esso Aruba, D.C., 94 F.Supp. 486, affirmed Standard Oil Co. v. Pocahontas S. S. Co., 1 Cir., 197 F.2d 422; cf. The Medford, D.C., 65 F.Supp. 622; Triton-Baranof, 1953 A.M.C. 393, 400 (Exchequer Court of Canada). Moreover, the Verdon's radar was on the one-mile range, and there was no time to make successive plots in order to establish courses of targets. There was no evidence to establish that a visual lookout was useless to avoid a collision, and the argument on visibility from the bridge points to the contrary. Nor does the testimony of the radar sighting of the vessel which turned out to be the Otco New York excuse the lapse, for I do not credit it. The Verdon's helmsman recalled no comment by the captain or mate to indicate a collision course just prior to collision, although the second officer testified that when he picked up what later proved to be the Otco New York and reported it to the master, the latter immediately stopped the engines and gave the reverse signal. The radar was on a one-mile range, and it was testified by the Verdon's captain that collision occurred in one to three minutes after the sighting at that distance. Even allowing generous leeway in the approximateness of time estimates, the speed of the Otco New York in these circumstances would be beyond the realm of reason. The discovery of the proximity of the Otco New York and the subsequent maneuvering by the Verdon must have taken place when the vessels were closely approaching each other.

The Verdon was guilty also of a violation of the narrow channel rule, Article 25 of the Inland Rules of the Road, 33 U.S.C.A. § 210. I have found that the collision occurred on the west side of the channel, with the inbound Verdon on a crossing course to the outbound Otco New York, which was properly keeping to the side of the channel lying on her starboard side. Striking evidence of this finding is the fact that the stem of the Otco New York struck the starboard bow of the Verdon. It is

suggested that the Otco New York was moving down the stream on the wrong side of the channel, mistaking the buoys to her starboard marking the easterly side for the buoys marking the westerly side. A subsequent right turn (the master of the Otco New York having testified that he eased right as he passed buoy 11) shortly before the collision would therefore be, not a turn outside the channel on the westerly side, but a turn into the channel from a position just eastward of the channel, and such a maneuver would account for the angle of the collision. I find no support for this speculation and the testimony of the Verdon's radar sighting of the Otco New York "dead ahead" is inconsistent with it. Some evidence on the location of the point of collision is the position in which the Otco New York anchored after disengaging from the Verdon, approximately 12 minutes after impact. That position, taken by visual bearings over a gyro repeater after the fog had cleared, is on the westerly edge of the channel below buoy 11, which the master said he had seen as he passed it just before collision. The Otco New York, in order to disengage from a locked position with the Verdon, had, for about 10 minutes after the collision, been backing (as was the Verdon) and pulling toward the buoy. She is a twin screw vessel and, according to the testimony of the master of the Verdon, the current at that point runs parallel to the channel. The captain of the Otco New York also marked the estimated point of collision on her chart at just outside the starboard side of the outbound channel, New Haven Harbor, approximately 300 feet from buoy 11. I accept his testimony on this score and believe it establishes the point of collision with reasonable accuracy. The Verdon has offered no proof to establish the point on the starboard side of the inboard channel. The probable explanation of the angle of collision, with the outbound Otco New York driving her stem into the starboard bow of the inbound Verdon, is that the Verdon, bound for West Haven, was making a left turn across the outboard channel toward her destination in the erroneous belief, owing to the fog, that she was in proper position for the turn. This explanation supports the credible testimony of the Otco New York's witnesses that the Verdon crossed from port to starboard.

The Otco New York, however, was guilty of contributing fault. Her testimony is that she delayed departure because of dense fog, but sailed when the visibility cleared to about 1,000 yards. But the weather record shows heavy fog at the time, with visibility under 1,650 feet. And her master testified that as the Otco New York backed away from the pier and straightened out in the channel, the fog closed in again, to the point where he couldn't see over 300 feet, slightly more than the length of the vessel. He testified further that he could have gone back to his berth. It may be that the fog, at sailing time, was not so dense as to have required the vessel to refrain from setting forth. See The Quogue, 2 Cir., 35 F.2d 683, 684; The John F. Breshnahan, D.C.S.D.N.Y., 58 F.2d 678, 679, affirmed, 2 Cir., 62 F.2d 1077. But there was heavy fog, nevertheless, and the master at no time attempted to get a weather report. Surely, good seamanship called at least for an attempt to obtain weather information in what was at best an equivocal situation, and it must be concluded that the failure to do so was negligence that contributed to the cause of damage. Charles Pfizer & Co. v. Conners Marine Co., 2 Cir., 175 F.2d 213; Pennsylvania Railroad Co. v. The S. S. Beatrice, D.C., 161 F.Supp. 136; The L. V. 472, D.C., 62 F.Supp. 152; cf. The Golden Rule, 1925 A.M.C. 297, affirmed 2 Cir., 278 F. 1021. And certainly, when the fog closed in immediately after the vessel backed away from the pier, she should have returned to her berth, as she could well have done, rather than risk the hazards of a well-traveled traffic lane in a condition of seriously curtailed visibility. See La Bourgogne, 2 Cir., 86 F. 475, 479, certiorari denied, 172 U.S. 646, 19 S.Ct. 883, 43 L.Ed. 1180; The Persian, 2 Cir., 181 F. 439, 447; The Quogue,

supra. The running of this risk was a contributing cause of the collision.

I find further that the Otco New York was in violation of Article 16 of the Inland Rules of the Road, 33 U.S.C.A. § 192, in that she did not navigate with caution after stopping her engines upon hearing a fog signal of a vessel apparently forward of her beam, the position of which was not ascertained. It is admitted by the master that he heard fog signals coming from a position apparently forward of his beam. He testified that he put the engines on stop, and then proceeded ahead at different speeds and not just under a slow bell, although it is insisted that she was maintaining bare steerageway. It is contended that her maximum speed at any one time could not have been more than 3.6 knots, with estimates by the lookout and chief mate ranging from two to two and a half knots. But the logbook indicates that she cleared Monsanto Pier at 0640 and the collision occurred at 0657. The master testified that it took three or four or five minutes to get squared away and heading downstream. The distance to his own estimated point of collision was 1.2 miles as the crow flies, and slightly more in actual distance covered. This distance was covered in an estimated 14 minutes, to use the slowest figure. A simple computation demonstrates that the Otco New York was making somewhere in the neighborhood of five miles an hour, even allowing reasonable leeway for the approximateness of the times recorded and estimated. The fact that the stem of the Otco New York penetrated six or seven feet into the bow of the Verdon, which was either dead in the water or making sternway, is eloquent testimony to the excessive forward speed of the former. Such speed, in the circumstances, did not constitute navigation with caution under Article 16, and this fault was a contributing cause of collision.

I conclude that both vessels were at fault and the rule of divided damages applies. An appropriate interlocutory decree may be submitted.