**CITIES SERVICE OIL COMPANY**
v.
**M/V MELVIN H. BAKER, Etc.**

**SEAWAYS SHIPPING COMPANY**
v.
**S/T CITIES SERVICE MIAMI et al.**
**No. 411.**

United States District Court
E. D. Pennsylvania.
Sept. 30, 1966.

Krusen, Evans & Byrne, by Eugene R. Lippman, Philadelphia, Pa., for libellant and cross-respondent.

Clark, Ladner, Fortenbaugh & Young, by Benj. F. Stahl, Jr., Philadelphia, Pa., Zock, Petrie, Sheneman & Reid, by John R. Sheneman, New York City, for respondent, cross-libellant.

HIGGINBOTHAM, District Judge.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

During the early morning hours of November 16, 1961, on the Delaware River along a ridge known as "Little Tinicum Range" the Cities Service Miami, libellant, an American flag vessel with an American crew, was proceeding outbound and the Melvin H. Baker, respondent, a Liberian flag vessel, with a Chinese crew, was proceeding inbound. The collision occurred in a dense fog bank which each ship had entered shortly before. Both of the radars on the Miami bridge were in operation on the night in question; it had a bridge-to-bridge radio telephone which was in operation and a course recorder. The Melvin H. Baker's radar was inoperative; it apparently did not have a course recorder; its pilot had brought on board a bridge-to-bridge portable which was inoperative and its ship radio telephone was operating but was not used before the collision—though it was used after the collision. The radar target of the Melvin H. Baker was picked up first by the Miami at a distance of approximately two miles ahead, the Melvin H. Baker was on the Tinicum Range; Pilot Davis of the Miami tried twice to contact this target by bridge-to-bridge radio and started to sound fog signals somewhere along Billings Point Range—which range preceded Tinicum—because he could not see the target ahead visually. The Captain of the Baker testified that visibility closed in at approximately 0200 and that the collision was at 0204. The evidence indicates that the pilot of the Baker was "lost" in the fog in that he was uncertain as to his exact location as he was changing his course in preparation for anchoring. There are hundreds of pages of record describing the visibility, weather conditions, alleged course

of the vessels, their speed and the fog signals which were allegedly given prior to the accident.

## DISCUSSION

All of the parties concede that the "principal issue"[1] is: which ship was in its proper lane at and immediately prior to the time of the collision—thus which ship veered into the wrong lane and thereby caused the accident?

It is not an easy task to reconstruct this collision and the major events prior thereto so that the precise location of the accident and the prior steerage and course of the ships are established by a preponderance of the evidence.

In addition to the undisputed "facts", typical of the numerous variables which must be considered and weighed are: a reconciliation for compass readings by reason of the fact that there was a one degree plus easterly gyro error on the Miami's compass and a one degree westerly gyro error on the Baker's compass. Actual speeds and stopping time cannot be determined by reference to the vessels r. p. m., but must be calculated after one's estimate of the actual current at the time of the collision and one's determination of the current's vectors working with or against the vessels. Of course in addition to all of these factors, there must be a reconciliation of the Miami's course recording readings with the compass error, and an adjustment for the estimated current after establishment of the differential in which the course recorder clock lagged the bridge time for the establishment of the time and location of the accident.

██ In fact, at one point during this case, all counsel were invited to comment on the doctrine of "inscrutable fault" and its application or relevance to this case.[2]

Unlike a highway, a seaway has no painted center line to aid in subsequently establishing which party veered into the wrong lane. It has no road top where immediately after an accident burned-in skid marks or fallen debris or fender dirt can be found *unmoved* as a type of evidence which is often so meaningful even to laymen in ascertaining the precise direction of the instrumentalities before a crash and the point of impact. In contrast, this collision took place in banks of fog on the darkened Delaware River with an outbound current of at least one knot at approximately 2:05 A.M. Thus resolution of the principal issue partially rests on the accumulation and reconciliation of pre-collision data as synthesized in the analysis of two opposing experts—these experts attempted to reconstruct the scene of the collision, the point of contact and to describe the path, speed and theoretical stopping distances of the vessels for the crucial minutes prior to the accident. Not unsurprisingly, both the libellant and respondent presented men with superior academic credentials, who significantly disagreed as to the point of the collision and as to the precise course of the vessels at and immediately prior to the point of impact. In addition to the extensive cross-examination of the experts by opposing counsel, I also questioned all of the experts to ascertain the reasons and probe the logic in support of their diametrically opposite final conclusions and to determine the weight they gave to various conflicting data presented at the trial.

1. Libellant phrases the issue in its reply brief as follows: "Both sides agree that the crux of this suit is which vessel was time of the accident". (Plaintiff's reply brief, p. 1). Respondent states "The on its proper side of the channel at the principal issue before the court is whether or not the S/T Cities Service Miami retained her position in the right side of the channel prior to the collision". (Respondent's brief, p. 16).

2. "Inscrutable fault" is said to exist when "the court concedes that a fault has been committed, but is unable, from the conflict of testimony or otherwise to locate it". The Worthington and Davis, 19 F. 836, 839 (E.D.Mich.1883); see also The Jumna, 149 F. 171, 173 (2nd Cir. 1906), the Law of Admiralty, Gilmar and Black, p. 396.

■ After having weighed with deliberate care the uncontradicted facts of record with the assumptions, disputed precollision data and the conclusions of the experts, I find that the analysis and conclusions of the Miami experts are far more plausible, persuasive and logical than the analysis and conclusions of the Baker's experts. The conclusions and opinions of the Miami's experts are fairly supported by at least a preponderance of the evidence and sustain and require a finding that at the time of the collision, and at the critical times prior thereto, the Miami was proceeding on the proper side of its channel and the Baker had veered into the Miami's channel. I recognize that in the prior recitation of facts under the discussion phase of this opinion that I have not mentioned all of the factors which are favorable to either respondent or libellant, but at least I have weighed these factors. In the fact finding process it became abundantly clear that the Baker could not be absolved of fault, but the more difficult determination would be whether the instant matter was a case of mutual fault of both parties or solely the fault of the Baker, and I find that libellant Miami met its burden by establishing by a preponderance of the evidence that *only* the Baker was at fault.

■ However, in addition to its challenge as "a principal issue" that the Miami was on the improper side of the channel, respondent makes additional subordinate allegations to "establish" that the Miami was at fault by reason of "excessive speed, reckless navigation, inefficient use of radar and radio telephone and improper lookout". I find that the Miami proceeded at a rate of speed which permitted it to stop within the limits of visibility at all times until it entered dense fog after passing 5 T on Tinicum Range; and further that when visibility did suddenly close in, Pilot B. Davis immediately reduced speed to Dead-Slow Ahead—to bare steerageway. After Pilot B. Davis ordered the engines dead-slow ahead, he heard a fog signal from a vessel ahead; upon hearing it he ordered the engines stopped and the engine bell book disclosed this order was logged at 0203½. In every respect the Miami appeared to have followed the rule enunciated in The Martello, 153 U.S. 64, 14 S.Ct. 723, 38 L.Ed. 637 (1894) which establishes the rules and standard for moderate speed in a fog. As stated in The Virginia and Joan, D.C., 13 F.Supp. 419, 421, affirmed 1st Cir., 86 F.2d 259 (1936): "A moderate speed means a speed slow enough to enable the vessel to stop upon sighting an approaching ship, supposing that the latter also is going at a moderate speed, except that the vessel may maintain sufficient speed to enable her to remain under command." See also: Pennsylvania Railroad Co. v. Central Railroad of New Jersey, 2 Cir., 103 F.2d 428 (1939); Skibs A/S Siljestad v. S/S Mathew Luckenbach, D.C., 215 F.Supp. 667 (1963); Eastern Steamship Co. v. International Harvester, 6 Cir., 189 F.2d 472 (1951).

■■ The Pilot, Bernard Davis, testified, and I accept his testimony as credible on this phase, that the fog bank in which the Miami found itself immediately prior to the collision was so dense he would have proceeded to an anchorage were he able; however, the Baker upbound near the center of the channel prohibited him from crossing to an anchorage on the New Jersey side of the channel. Thus the passage had to be first accomplished since there was no anchorage on the Pennsylvania side, and if at the point immediately prior to the collision on the Tinicum Range the Captain of the Miami had attempted to have anchorage in the channel, on ebbtide his vessel, the Miami, would have swung across the paths of other vessels which would have been proceeding inbound in their proper lane. Under the circumstances of this collision I do not find that there was reckless navigation on the part of the Miami or an inefficient use of radar and radio telephone or improper lookout, and further as to any of these alleged faults or failures by the crew of the Miami, these failures did not con-

stitute a factor in causing the accident. The Baker turned a safe passage into collision by suddenly veering into its lefthand side of the channel and across the Miami's bow when the vessels were a half mile or less apart. Thus I concur completely with the conclusions as stated by libellant in its reply brief "If the Baker suddenly turned [and I have found it did] in front of the Miami when the vessels were less than a half mile apart, no radar, no lookout and in all likelihood, no amount of visibility could have avoided the collision. All parties who observed the picture developing on radar, are in agreement that initially, the passing could have been accomplished safely and without incident." The Baker's improper veering to its left into the Miami's channel altered this situation.

To the extent that what I have said constitute findings of fact and conclusions of law, this opinion shall be considered as containing them. In addition, I affirm, albeit in different form, plaintiff's request for findings of fact Nos. 1 through 31. I also affirm defendant's request for findings of fact Nos. 1, 2, 3, 4, 5, 6, 7 (except as to No. 7, I neither affirm nor deny the mathematical computations for the computed speeds); 8, 10, 11, 13, 14, 16 and 24. All requests for findings of fact and conclusions of law not in harmony with those stated in this opinion are severally denied.

## CONCLUSIONS OF LAW

1. The Delaware Channel on the Little Tinicum Island Range is a narrow channel.

█ 2. The officers and crew members of the Melvin H. Baker were at fault in failing to report to their Pilot the whistle signal from ahead that they heard approximately two minutes prior to the collision.

3. The Pilot of the Melvin H. Baker without radar and bridge-to-bridge radio-telephone was lost.

4. Collision was caused by the fault of the Melvin H. Baker in crossing into the wrong side of the channel across the bow of the Cities Service Miami when the vessels were approximately one-half mile or less apart.

5. When the Melvin H. Baker swung into the path of the Cities Service Miami, collision could not be avoided.

6. The collision was not caused by any fault or improper judgment on the part of the Cities Service Miami.

## ORDER

And now, this 30th day of September, 1966, the parties are directed to submit a proposed order for the appropriate implementation of these findings of fact and conclusions of law and opinion.