**NORSCOT SHIPPING COMPANY, Ltd., as owner of the MOTOR VESSEL, NORSCOT, Libellant,**

v.

**STEAMSHIP PRESIDENT HARRISON, her engines, boilers, etc., and her owners, American President Lines, Ltd., Claimant-Respondent.**

No. 25 of 1965.

United States District Court, E. D. Pennsylvania.

Jan. 29, 1970.

■■■■■■■■■■■■■■■

———◆———

Richard W. Palmer, Rawle & Henderson, Philadelphia, Pa., for libellant.

James F. Young, Krusen, Evans & Byrne, Philadelphia, Pa., for claimant-respondent.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

### FINDINGS OF FACT

WOOD, District Judge.

1. Libellant, Norscot Shipping Company, Ltd., is a limited business company organized under the laws of the United Kingdom and at all times hereinafter was the owner of the Motor Vessel NORSCOT.

2. Respondent, American President Lines is a corporation organized under the laws of Delaware and at all times hereinafter owner of the Motor Vessel PRESIDENT HARRISON.

3. The NORSCOT is a tankship 556 feet in length, 73 feet in beam. At the time of the collision, she was drawing 31 feet 9 inches aft and 29 feet 5 inches forward. (N.T. 136, 12–13)

4. The PRESIDENT HARRISON is a C–3 type cargo vessel 492 feet in length and having a beam of 69 feet. At the time of the collision, the PRESIDENT HARRISON was drawing 11 feet forward, 19 feet 8 inches aft. (N.T. 420)

5. At 1710, (NORSCOT and PRESIDENT HARRISON bridge time) on May 14, 1961, the vessels collided in Liston Range of the Delaware River. At the time of collision, wind was from the southeast at about 5 miles an hour, the current was ebbing or running toward the sea at about 1.5 knots. Visibility was about 300 feet because of heavy fog. (N.T. 18, 45–7, 659–60, 667–8)

6. On May 14, 1961, the HARRISON was inbound on the Delaware Bay and River with a destination of Baltimore, Maryland, having arrived in the vicinity of the pilot station off Lewes, Delaware and picked up a pilot at 1320 hours that day. (N.T. 318)

7. The HARRISON proceeded at various speeds up Delaware Bay, encountering occasional fog requiring speed reductions until or about 1631 hours when her engines were reduced from full ahead to half ahead giving her a speed of approximately 6.4 knots over the ground considering the ebb tide she was meeting. (N.T. 411, 415, 588)

8. At this time, the pilot was on the bridge accompanied by the master, the officer of the watch, and helmsmen. A lookout was posted on the bow of the HARRISON. (N.T. 21)

9. As the HARRISON proceeded up Delaware Bay and turned off Cross Ledge to Liston Range the visibility gradually reduced to approximately 300' or less. (N.T. 414)

10. The HARRISON continued on her course up the Liston Range channel, maintaining a speed of approximately 6 knots, blowing fog signals, meeting and passing various traffic in the other direction, and following another vessel ahead, intending to keep to the left of the channel and give Ship John Light a wide berth. (N.T. 656, 657, 661, 667)

11. It is common practice among pilots on the Delaware River for upbound vessels to give Ship John Light a wide berth and proceed up on the west or left hand side of the channel. (N.T. 230, 231, 667) Under such circumstances, when downbound traffic approaches Ship John, it is normal procedure for the upbound vessel to move to its right, i. e. to the west or New Jersey side of the channel. (N.T. 245)

12. At or about 1655 hours, the second mate was relieved by the junior third mate on the bridge as the vessel was approaching the vicinity of Ship John Light. Subsequently, the vessel that the HARRISON was following, the SUN OIL, was observed to be passing a downbound vessel. (N.T. 398, 297, 298)

13. The fog signal from Ship John Light was heard by those in charge of the HARRISON and the pilot, after observing the position of the vessels ahead on radar, sometime later went out on the starboard wing of the HARRISON's bridge in an effort to visually sight Ship John Light. (N.T. 298-9, 662)

14. At or about 1709 hours Ship John Light was passed by the HARRISON, 4/10's of a mile off, and such passing was duly recorded on her chart. (N.T. 663, 671, Ex. L-22)

15. The HARRISON's pilot then returned to the radar but did not sight the approaching NORSCOT again before the collision which occurred immediately thereafter. (N.T. 678)

16. Shortly before 1710 hours the mate, standing on the port wing of the HARRISON's bridge, heard a fog signal from another vessel ahead, reported it to the pilot, and then also received a phone call from the HARRISON's bow lookout reporting the whistle. (Ex. L-34, p. 44)

17. Immediately thereafter, the bow of the approaching NORSCOT was observed by both the bow lookout and the mate coming out of the fog heading directly for the HARRISON's bow. The lookout did not have time to report the sighting of the NORSCOT by phone but shouted to the bridge and ran off the bow for his own safety. Within seconds after the hearing of the NORSCOT's whistle and visual sighting of the NORSCOT, the bow of the HARRISON and the port side of the NORSCOT came into collision at 1710 hours on Liston Range approximately 4/10's of a mile west of Ship John Light. (N.T. 458, 645, 646, 647, 668)

18. The collision occurred before any effective helm or engine orders could be executed by the HARRISON. (N.T. 668)

19. On the afternoon of May 14, 1961, the NORSCOT anchored at Kaighns Point off Philadelphia and Pilot Glenn Davis boarded her at 1220 hours for a voyage outbound from Philadelphia with a cargo of river water. (N.T. 11, 12)

20. Shortly after Pilot Davis boarded the vessel, her anchor was raised and Pilot Davis ordered full ahead on her engines at 1251 hours. (N.T. 68)

21. Pilot Davis then gave various engine orders at slow and half ahead until or about 1510 hours when the engines were put full ahead and remained on full ahead until 1706 hours. During this period the vessel was making a speed of 12.5 knots through the water and 14 knots over the ground. (N.T. 68, 18, 43)

22. The voyage proceeded without incident until the vessel turned onto the upper reaches of Liston Range sometime after 1600 hours that day and a fog bank was sighted ahead obscuring Ship John Light. (N.T. 73) After sighting the fog bank in the vicinity of Buoy 8-L, the NORSCOT's radar was turned on for the first time and placed on a three mile range or distance. (N.T. 23-4)

23. At Buoy 8-L, the NORSCOT passed an upbound tanker port to port. At this time, the NORSCOT was steering 138° True, the outbound channel course, and was about in the center of the channel. (N.T. 26, 35, 102) At Buoy 7-L, the NORSCOT hauled to a course of 139° True which would take her further to the right. (N.T. 37, 103) As NORSCOT passed 6-L, she was close to her own right-hand edge of the channel. (N.T. 104)

24. The NORSCOT continued without reduction of speed. Shortly before 1704 hours the pilot suggested that a lookout be placed on the bow. Although a lookout was called for by the cadet, he never took his station on the bow before the collision which thereafter ensued. (N.T. 59, 140, 141)

25. The NORSCOT passed buoy 4-L at 1640. About this time she observed the pip of the upbound tanker SUN OIL in her radar at her port side about 3 miles distant. (N.T. 35-6, 106)

26. As the NORSCOT passed Buoy 42 at about 1650, she came right to a

course of 141° True. NORSCOT advised the SUN OIL by portable radio telephone of the foregoing course change and also confirmed the agreement for the port-to-port passing. (N.T. 36–40)

27. Shortly after passing Buoy 42 the fog became denser and visibility reduced to one-half mile. (N.T. 76) About a mile below buoy 42 the NORSCOT ran into dense fog and visibility was reduced to about a ship's length. (N.T. 39, 76)

28. The upbound SUN OIL tanker was passed safely approximately 200' apart at a distance about 2½ miles below Buoy 42. (N.T. 37, 104)

29. After passing the SUN OIL tanker, at or about 1704 hours, Pilot Davis then looked into the radar and for the first time observed the upbound HARRISON, two miles away, directly ahead. (N.T. 40, 41) At this time Pilot Davis recognized that the HARRISON was on the same side of the channel as the NORSCOT. (N.T. 80)

30. The NORSCOT nevertheless proceeded ahead on full speed until at or about 1706 hours when her engines were ordered reduced to half ahead and her course was changed from 141° to 145°. (N.T. 43)

31. At 1707 hours, the NORSCOT's engines were put on slow ahead and the NORSCOT proceeded on her course of 145° until at or about 1710 hours when the HARRISON was sighted visually approximately 350' away from the NORSCOT's bridge coming out of the fog and the collision ensued immediately thereafter with the bow of the HARRISON striking the port side of the NORSCOT and causing her to be damaged from her bow back to her bridge. (N.T. 46–7, 55)

32. Immediately prior to the collision the NORSCOT did not execute any further effective helm or engine orders to avoid collision. (N.T. 66, Ex. L–4)

33. The lookout never arrived on the NORSCOT's bow prior to the collision although a lookout on the bow would have been 200' forward of the NORSCOT's bridge. (N.T. 79, 80)

34. The pilot in charge of the SS GULFKING, upon meeting the same fog conditions as she preceded the NORSCOT down river, reduced her speed to slow ahead at or about the time she passed Buoy 4–L, placed a lookout on the bow, and commenced blowing fog signals at one minute intervals well before entering the fog bank itself. (N.T. 228–9) At the time the SS GULFKING entered the fog bank she was making a speed of approximately 4.7 knots and when she met approaching traffic she either reduced her speed to dead slow ahead or stopped her engines on occasion. (N.T. 248–9)

35. The greater the speed at which a vessel is traveling, the greater should be the range setting of its radar. (N.T. 520–1)

36. The range of the NORSCOT's radar could have been increased beyond 3 miles as it approached fog without undue risk. (N.T. 520)

37. The greater a vessel's speed, the less time the radar observer on that vessel has to make calculations respecting obstacles in the vessel's path.

38. A vessel proceeding in fog with visibility of only 300' should have a lookout placed on the bow since that is the point furthest forward and lowest down on a vessel where approaching traffic may be seen and heard before those on the bridge. (N.T. 769)

39. The fog at the time of the collision was hanging off the water a little and a lookout on the bow could see better than someone on the bridge who would be higher up and in more fog. (N.T. 642, 59, 140–1)

40. The mate of the NORSCOT heard the fog signal of the HARRISON twice, the first time 2 to 4 minutes before collision but did not report it to the pilot. The NORSCOT's pilot and master only heard the HARRISON's fog signal just before or at the time of visual sighting. (N.T. 47, 152, 763–4)

41. After sighting the HARRISON at two miles, considering the HARRISON's 6.4 knot speed, the vessels closed

to collision within six minutes and the NORSCOT therefore made a speed during that interval of somewhat in excess of 13 knots, since that, of necessity, had to be the combined speed of the vessels to cover a two mile distance in six minutes. (N.T. 596–8)

42. When the NORSCOT's engines were reduced from half ahead to slow ahead at 1707 hours, the NORSCOT was still making 13.47 knots over the ground. (N.T. 682–3)

43. At the time of the collision, or after the NORSCOT's engines had been slow ahead for three minutes from 1707 hours, the NORSCOT was still making 11.31 knots over the ground. (N.T. 683)

■ 44. A speed of 14 knots with a visibility of only 300′ is excessive. (N.T. 770–1)

■ 45. When the NORSCOT sighted the HARRISON on radar, two miles distant, bearing dead ahead, and the NORSCOT was proceeding at a speed of 14 knots, she was already in an emergency situation and her engines should have been immediately backed full, her helm put hard right, a danger signal blown, and her anchors dropped. (N.T. 774)

46. A hard right rudder order by the NORSCOT at any time up until and including 1708½ hours would have cleared the path of the approaching HARRISON. (N.T. 686–8, Ex. R–3)

■ 47. The radar bearing of an approaching vessel which remains fairly constant is indicative of a collision course and requires immediate and radical avoiding action by the observing vessel. (N.T. 775–6)

48. The radar bearing of the PRESIDENT HARRISON as observed by Captain Davis on the NORSCOT became fairly constant between 1½ and 2 minutes before collision, or between 1708 and 1708½. (N.T. 45–6)

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action.

2. The respondent has conceded that its vessel, the PRESIDENT HARRISON, committed negligent acts which were causes of the collision between the PRESIDENT HARRISON and the NORSCOT.

■ 3. 33 U.S.C. § 192 provides that "Every vessel shall, in a fog * * * go at a moderate speed,[1] having careful regard to the existing circumstances and conditions." Where a vessel violates this statute by proceeding through fog at an immoderate speed, her only chance to extricate herself from liability resulting from her collision with another vessel is not to show that the other vessel was guilty of a more flagrant fault but rather to show that such statutory fault not only did not cause, but could not possibly have caused the collision in question. *O/Y Finlayson Forssa A/B v. Pan Atlantic SS Corp.*, 259 F.2d 11 (5th Cir. 1958); *The Pennsylvania*, 19 Wall. (86 U.S.) 125, 136, 22 L.Ed. 148 (1873).

1. There is no given speed which is deemed "moderate". As the Court stated in Polarus Steamship Co. v. The T/S Sandefjord, 236 F.2d 270, 271–272 (2nd Cir. 1956): " 'Moderate' speed is undoubtedly less than full speed. * * * But the term is a relative one, and precisely how much less the statute requires depends on the particular circumstances of each case. * * *

"True it is that there are statements that in congested harbor waters, and at times elsewhere, anything more then bare steerageway in the presence of fog may be too much. * * * Even more frequently, the applicable rule has been said to be that no vessel should be operated in a fog at a speed which is so fast that she cannot stop within the distance her helmsman can see ahead. * * *

"But these are not rules of thumb to be applied willy-nilly. They are but glosses upon the basic rule requiring operation at a moderate speed, and, like it, they must be applied according to the particular circumstances of each case." (Citations omitted throughout)

See also Cities Service Oil Company v. M/V Melvin H. Baker, 260 F.Supp. 244 (E.D.Pa.1966, per Higginbotham, J.) and cases therein cited; Farwell, The Rules of the Nautical Road, p. 313 (3rd Ed. 1954).

■ 4. The NORSCOT was proceeding at an immoderate speed in violation of 33 U.S.C. § 192 at all times after it entered dense fog up until its collision with the PRESIDENT HARRISON.

■ 5. The libellant has failed to sustain its burden of proof that its excessive speed was not a contributory cause of the accident. To the contrary, we find that had the NORSCOT proceeded at a moderate speed[2], each vessel would have had more time to apprehend the other, and the collision could have been averted.

6. The NORSCOT did not have a lookout on her bow immediately prior to the collision. *Cf.* 33 U.S.C. § 213.

■ 7. Failure to have a lookout on a vessel's bow is a statutory fault and imposes on the guilty vessel the burden of showing beyond a reasonable doubt that the fault could not have contributed to the collision. Rice v. United States, 168 F.2d 219 (2nd Cir. 1948); Moore-McCormack Lines, Inc. v. SS Portmar, 249 F.Supp. 464 (SDNY 1966).

■ 8. The libellants have failed to sustain their burden of showing that the absence of a lookout was not a cause which contributed to the collision.[3]

■ 9. The libellant contends that the NORSCOT did not sight the HAR-RISON on radar until after it passed the SUN OIL at 1704 hours and did not fix the HARRISON on a constant bearing until several minutes thereafter, at which time the NORSCOT was *in extremis* and could not have avoided collision. To the contrary, we find and conclude that the NORSCOT was not navigated in a reasonable and prudent manner in the period before collision in that: it failed to set its radar for a greater range prior to entering the fog so that it could prepare to navigate with respect to obstacles in the fog; it passed the SUN OIL at such an immoderate speed that it did not have reasonable time to maneuver with respect to any vessels following the SUN OIL; it failed to recognize an emergency situation and take appropriate corrective measures when its officers sighted the HARRISON two miles distant, bearing dead ahead (*Cf.* Finding of Fact No. 45); and it failed to execute a hard right rudder prior to 1708½ hours. (Cf. Finding of Fact No. 46)

■ 10. The damages of the collision should be shared equally by the parties.[4]

11. The foregoing Conclusions of Law numbers 5, 8, and 9 are each independently sufficient to support Conclusion of Law No. 10.

---

2. Indeed with visibility reduced to a ship-length, it would seem that both ships should have dropped anchor. *Cf.* Oil Transfer Corp. v. Diesel Tanker F.A. Verdon, Inc., 192 F.Supp. 245 (SDNY 1960); The Quogue, 35 F.2d 683 (2nd Cir. 1929).

We also note that use of radar is not an excuse for exceeding moderate speed. Wood v. United States, 125 F.Supp. 42 (SDNY 1954). In any event, we have concluded elsewhere that the NORSCOT's radar range should have been set at a greater distance under the circumstances.

3. *Cf.* Finding of Fact No. 40. The mate of the NORSCOT heard the fog signal of the HARRISON ahead two to four minutes before collision. A bow lookout might have heard the signal even sooner. Indeed, a lookout was sent to the bow just prior to the collision (but never reached there) because the pilot thought he might be able to hear something which might not be heard elsewhere. (N.T. 70)

4. Contrary to the assertions of the libellant, there is no major-minor fault rule in this Circuit. If a minor fault of one vessel was a contributory cause of the collision, that vessel should bear the costs of the collision equally with any other vessel at fault in causing the collision. Tank Barge Hygrade v. Gatco New Jersey, 250 F.2d 485, 488 (3rd Cir. 1957); Tide Water Associated Oil Co. v. The Syosset, 203 F.2d 264, 268 (3rd Cir. 1953). In any event, we think that the parties here were about equally at fault in causing the collision.