UNITED STATES of America, as owner of the USS WHITEHURST, Libelant,

v.

The MOTOR SHIP HOYANGER, her Engines, Tackle, Apparel and Furniture, etc., and Westfal-Larsen & Co., A/S, as owner of the M.S. Hoyanger, Respondents,

Westfal-Larsen & Co., A/S, Claimant.

WESTFAL–LARSEN & CO., A/S, Cross-Libelant,

v.

UNITED STATES of America, Cross-Respondent.

No. 17038.

United States District Court
W. D. Washington, N. D.

Feb. 9, 1967.

Eugene G. Cushing, U. S. Atty., Michael Hoff, Asst. U. S. Atty., John F. Meadows, Atty. in Charge, Henry Haugen, Atty., Admiralty & Shipping Section, Dept. of Justice, Seattle, Wash., for libelant.

Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for respondents.

BEEKS, District Judge.

The above-entitled cause having come on for trial during the week of December 19, 1966, before the Honorable William T. Beeks, Libelant and Cross-Respondent United States of America being represented by Eugene G. Cushing, United States Attorney, Michael Hoff, Assistant United States Attorney, John F. Meadows, Attorney in Charge, West Coast Office, Admiralty and Shipping Section, and Henry Haugen, Attorney, Admiralty and Shipping Section, Department of Justice; and Respondent and Cross-Libelant Westfal-Larsen & Co., A/S, being represented by Edward C. Biele of Bogle, Gates, Dobrin, Wakefield and Long, and oral and documentary evidence having been introduced and the Court having considered all the testimony and evidence and being fully advised in the premises, the Court now makes the following:

FINDINGS OF FACT

A. JURISDICTION

1. This litigation arises out of a collision between the USS WHITEHURST and the Norwegian flag M/S HOYANGER on January 16, 1965, at the entrance to the harbor of Vancouver, British Columbia, and within the territorial waters of Canada. Both vessels were in Seattle, Washington, and within the jurisdiction of this Court when the actions were commenced. No other actions concerning this collision have been filed in any other court, foreign or domestic.

2. The parties have agreed that the substantive law of Canada applies. The International Regulations for Preventing Collisions at Sea ("International Rules") applies to the waters in question, but the 1960 amendments relating to the use of radar were not in effect on the date of the collision and have not been considered. The parties have further agreed that the proportional fault rule applies since Canada adheres to the 1910 Brussels Convention. Article 4 of that Convention reads:

If two or more vessels are in fault the liability of each vessel shall be in proportion to the degree of the faults respectively committed. Provided that if, having regard to the circumstances, it is not possible to establish the degree of the respective faults, or if it appears that the faults are equal, the liability shall be apportioned equally.

B. USS WHITEHURST

3. The USS WHITEHURST (DE-634) is a destroyer escort 306 feet in length, 36 feet in breadth, and of 1800 tons displacement. The vessel has turbo-electric power, each of her two engines being of 6,000 horsepower. The vessel has twin propellers and twin rudders.

4. The WHITEHURST is owned and operated by and through the United States Navy and is a public vessel of the United States. The vessel is armed for surface, air, and anti-submarine warfare. The WHITEHURST is operationally classified as a "Group 2 Naval Reserve vessel." A nucleus crew of 45 to 50 active duty Naval personnel was maintained on the vessel at all times. A Naval Reserve crew of an authorized strength of 10 officers and 151 enlisted men was also assigned to the vessel. The home port of the WHITEHURST is Seattle, Washington.

5. During the period January 15 to 17, 1965, the WHITEHURST had both her nucleus crew and reserve crew embarked. The vessel engaged in various fleet exercises in company with the USS MARSHALL (DD-676), a destroyer, and the USS BRANNON (DE-446), a destroyer escort, in conjunction with an Operational Readiness Inspection conducted by personnel of the 13th Naval District. The general area of these maneuvers was from Seattle, Washington, to Vancouver, British Columbia.

6. The WHITEHURST approached Vancouver in the late afternoon of January 16, 1965, with the intention of entering the harbor for the night. Dense fog was encountered and when the fog failed to lift after several hours, the WHITEHURST commenced her passage into the harbor. The MARSHALL had entered the harbor several hours before and the BRANNON followed the WHITEHURST at a distance of about one mile.

7. The WHITEHURST was equipped with a type SPS-5C radar and her navigation was primarily accomplished by this means. One navigational team was stationed in the Combat Information Center and, through the use of a radar repeater, another navigational team was stationed on the bridge.

8. Vancouver Harbor is characterized by a narrow entrance known as First Narrows. The Lions Gate Bridge passes over this entrance and is high enough to allow the passage of all shipping here involved. The Canadian Government, through the National Harbour Board, Ministry of Transport, maintains the First Narrows Signal Station at approximately the center of the Lions Gate Bridge. This station is equipped with a "loud hail" (public address system), radar, a radio-telephone communications system and displays both day and night signals to inform mariners of the presence of other vessels in the First Narrows. Signalkeeper J. Varley was on duty at the Station at the time of the collision.

9. During the period preceding the collision, there was maritime traffic both inside and outside the harbor. The First Narrows Signalkeeper's records show the following traffic passing under the Lions Gate Bridge:

1832—C. P. YORKE (Tug and Tow)
　　　—inbound

1833—ITALMARE (Italian ocean-going vessel)—outbound

1847—PRINCESS OF VANCOUVER (Canadian ocean-type ferry)—inbound

1847—HOYANGER—outbound

10. Collision occurred at WHITEHURST time 1849 and at HOYANGER time 1850. The parties are in dispute as to the position of the collision, the navigational testimony, if fully accepted, leaving the vessels approximately 175 yards apart at the time of the collision. Exhibit 102 is a demonstrative display on a chart of the navigational evidence presented to the Court. Because of the time differences on each ship, the positions on Exhibit 102 are given by reference to minutes preceding and following the collision.

11. The course of the WHITEHURST indicated on Exhibit 102 is approximately correct up to the position denominated C-2, at which time it is contended she changed course from 090 degrees true with 15 degrees right rudder, to come up on a course of 105 degrees true. The Court is satisfied that a course of 105 degrees true was never made good. The vessel was on a course of approximately 090 degrees true until approximately two and a half minutes prior to the collision, when she was observed by Signalkeeper Varley, on radar, at the position marked C-2½ on Exhibit 102, which is one-half a statute mile on a bearing of 288 degrees true from the signal station on Lions Gate Bridge. It is possible that Varley's estimate of time and range or distance may not be precise, but the Court accepts his testimony with respect to the bearing as being accurate, and as to time and range as being approximately correct.

12. The engines of the WHITEHURST were stopped at her time 1845 and as the vessel lost way she was set to the north. The engines were next operated for about one minute, but this was ineffective to put way on the vessel. Upon hearing the HOYANGER's fog signal, the engines were again stopped. This was approximately two minutes prior to the collision when the vessel was approximately at the C-2½ position shown on Exhibit 102. At this point, the WHITEHURST received the full force and effect of the five knot ebb

current, which set her to the north across the course being traversed by the HO-YANGER, and the two vessels collided. The Court is not prepared to find that the collision took place as far north as that estimated by Varley and is unable to fix it with precision. The Court finds, however, that it was more to the south and west than the position fixed by Varley (his position of the collision was 650 yards bearing 302° from the signal station on the Lions Gate Bridge).

13. The National Harbours Board Act, 1936, Chapter 42, Section 1, defines Vancouver Harbour as including all tidal waters lying east of a line drawn from the Point Atkinson Lighthouse southerly to the most westerly point of Point Grey.

Rule 44 of the Operating Regulations of the National Harbours Board, applicable to the Harbour of Vancouver, provides that outgoing vessels shall, when safe and practicable, keep to the north of mid-channel in the First Narrows, and that incoming vessels shall, upon approaching Prospect Point and when safe and practicable, proceed cautiously to the south of mid-channel.

There is no doubt in the Court's mind but that the collision took place in a narrow channel, that the WHITE-HURST violated the narrow channel rule (Rule 25) by crossing the mid-channel line, and that she was at fault for so doing. In the circumstances of this case, it was a fault of the WHITE-HURST to permit herself to be in the position she was at the time of the collision even if it was found that the narrow channel rule was not violated.

14. At and prior to the time of collision the WHITEHURST had no forward motion whatsoever, not even sufficient to maintain steerageway or answer to her rudders. She was out of control, dead in the water, and being carried across mid-channel by the tidal current. The Court is satisfied that the track of both vessels up to this time was proper, and that if the WHITEHURST had made good her proposed track the vessels would have passed clear of each other. The WHITEHURST was at fault for failing to maintain steerageway.

15. Factors other than safety prompted the decision of the WHITEHURST to negotiate the First Narrows under the conditions of traffic, visibility and tidal current which existed. Since those in charge of the vessel did not have knowledge of local conditions, particularly of the speed, direction and effect of tidal currents in the First Narrows and since the navigation of the WHITEHURST was characterized by indecision, confusion, and ignorance, it was a fault on the part of the WHITEHURST to attempt passage of the First Narrows under the conditions then existing without utilizing a local pilot.

## C. HOYANGER

16. The HOYANGER, owned and operated by Westfal-Larsen & Co., A/S, of Norwegian registry, is a general cargo vessel displacing 9,447 tons, 511 feet in length, 64 feet in breadth, and was drawing (mean) 16 feet. The vessel is powered by a diesel engine of 7,700 horsepower driving a single propeller and being equipped with a single rudder. The vessel was built in 1959 and is generally engaged in carrying cargo from the Pacific Coast to Europe. The vessel carried a crew of 36 men including both officers and crew and is equipped to carry 12 passengers.

17. The HOYANGER had completed her cargo loading at Vancouver prior to 1800 January 16, 1965, and was then commencing her eastbound voyage to Europe via several other West Coast ports, her next port of call being Seattle, Washington. The HOYANGER embarked both a Canadian and an American pilot for the voyage from Vancouver to Seattle. She got underway at 1814 from LaPointe Pier 8 and proceeded outbound.

18. The HOYANGER was equipped with an RCA type CRM-NIA-75 Serial 9921 radar, manufactured in 1950, which was in use at all times preceding the collision. Generally, the Master, Olaf S. Nesheim, and the Canadian pilot, H. C. Coles, operated and observed the radar, which was located in the wheelhouse.

19. At about the time of passing under the Lions Gate Bridge the HOYANGER changed course to 295°. At about HOYANGER time 1848, she stopped her engines, having lost the WHITEHURST on radar. At about her time 1849, the WHITEHURST was sighted visually at a distance of 500 to 800 feet. HOYANGER's engine was reversed and rudder ordered hard right. Immediately thereafter, HOYANGER's engine was stopped and rudder ordered hard left in an attempt to avoid the collision. Collision occurred at HOYANGER time 1850.

■ 20. The HOYANGER could not be operated at a speed of less than five to six knots through the water, which was excessive under the conditions of visibility existing at the time of departure and at the time the vessel entered the First Narrows. The law required under the circumstances here present that the HOYANGER not be operated at a speed at which she could not be stopped dead in the water in one-half the distance of visibility ahead. Such is the moderate speed required by Rule 16(a) of the International Rules. This the HOYANGER could not do under the conditions existing and she was at fault for failing to proceed at a moderate speed.

21. The HOYANGER made a course good somewhat to the south of that which is shown on Exhibit 102. The vessel passed wide of Calamity Point Beacon, but the Court is not prepared to find that the HOYANGER was to the left of midchannel at any time.

22. The Government charges that the HOYANGER's radar was not properly used, and the HOYANGER charges that the navigators of the WHITEHURST failed to maintain good fixes, which the Court assumes means a failure to properly use the WHITEHURST's radar equipment. The Court gathers from the testimony that in heavy fog it is difficult for a vessel to obtain a target on her radar screen beyond the First Narrows Bridge, either inbound or outbound. Captain Coles, the pilot of the HOYANGER, so testified, and the experience of the radarman on the WHITEHURST seems corroborative, and the Court so finds. In such circumstances the Court is not prepared to find that the radar of either vessel was improperly used.

23. Each vessel was aware of the presence of the other for some period of time prior to the collision. Signalkeeper Varley informed the pilot of the HOYANGER of the inbound WHITEHURST at about 1800, and he informed the WHITEHURST with respect to the outgoing HOYANGER at a time when the naval vessel was approximately three miles west of the signal station. It was a fault for the pilot of the HOYANGER to fail to keep in communication with Varley at the First Narrows Signal Station on the Lions Gate Bridge with respect to the position of the inbound WHITEHURST. The WHITEHURST did so, but after receiving the original information from the signal station concerning the WHITEHURST, the HOYANGER never sighted the WHITEHURST by radar until she passed under the Lions Gate Bridge. She never asked the signalkeeper for information concerning the naval vessel, and because she failed to keep her channel of communication with the signalkeeper open she did not receive his warning of the sheer of the WHITEHURST across her course.

■ 24. Factors other than caution and safety prompted the decision of the HOYANGER to attempt passage of the First Narrows under the conditions of traffic, visibility and tidal current which existed. It is well settled that a vessel should remain at her dock rather than commence a voyage when she cannot proceed at a moderate speed in conditions of restricted visibility. The navigation of the HOYANGER was characterized by cocksure indifference, and it was a fault for the HOYANGER to depart and attempt passage of the First Narrows under the conditions then existing.

25. The HOYANGER was at fault for a failure to maintain a proper lookout in violation of Rule 29 of the International Rules. A lookout was posted in

the proper position of the HOYANGER, but a substitution of lookouts was made approximately two minutes prior to the collision at a time when the vessel was proceeding at a speed of approximately ten knots over the ground in heavy fog with extremely limited visibility and in a channel where heavy traffic was known to exist. It was known that at least two naval vessels were approaching, and there was no opportunity on the part of the lookout to adjust his eyes to the darkness and to become acquainted with sound signals forward of the beam. To substitute a lookout in the circumstances was a failure to have a proper lookout.

26. The remaining contentions of each vessel, and in particular the claim of the Government that the HOYANGER was at fault in failing to disengage herself more promptly following the collision, have not been established.

## D. DAMAGES

27. The HOYANGER penetrated the starboard quarter of the WHITEHURST with no loss of life or personal injuries on either ship. The vessels remained in contact until they were near the southern shore of West Vancouver at about 1900. They separated, but both vessels grounded near 17th Street, West Vancouver.

28. The HOYANGER was freed from her strand some two hours after the collision by local tugs and then proceeded to Seattle. Repairs were eventually effected in Antwerp, Belgium.

29. The WHITEHURST was freed from her strand at the next tide and was towed into Vancouver. She was later towed to Seattle and repairs were accomplished there.

30. Damages to the HOYANGER attributable to the collision are as follows (expressed in United States currency):

| | |
|---|---:|
| (1) Tugs, Vancouver, B. C. | $ 6,521.38 |
| (2) Drydocking & repairs Antwerp, Belgium | 8,153.02 |
| (3) Loss of use | 163.54 |
| (4) Inspection by divers | 262.50 |
| (5) Surveys & miscellaneous | 1,183.88 |
| TOTAL | $16,284.32 |

31. Damages to the WHITEHURST attributable to the collision are as follows (expressed in United States currency):

| | |
|---|---:|
| (1) Tugs, Vancouver, B. C. | $13,752.23 |
| (2) Inspection by divers, Vancouver | 969.50 |
| (3) Tugs, Vancouver-Seattle | 3,600.00 |
| (4) Repairs, Seattle | 33,130.00 |
| (5) Propeller repair | 4,230.00 |
| (6) Consumables during repair, loss of small arms and miscellaneous | 6,317.07 |
| (7) Off-loading ammunition | 353.26 |
| (8) Crew's pay during repair period (detention) | 11,000.00 |
| TOTAL | $73,352.06 |

32. Total damages of both vessels was $89,636.38.

### E. APPORTIONMENT OF FAULT

 33. The Court cannot place its imprimatur on the navigation of either vessel. Both were at fault and substantially so, but inasmuch as the WHITEHURST allowed herself to drift across the course of the HOYANGER the Court finds the WHITEHURST sixty percent at fault and the HOYANGER forty percent at fault.

34. Applying the proportional fault rule, the WHITEHURST shall bear $53,781.83 and the HOYANGER $35,854.55 of the total damages.

### CONCLUSIONS OF LAW

1. Jurisdiction in this Court exists under 28 U.S.C. § 1333 and as to the Cross-Libel against the United States under the Public Vessels Act, 46 U.S.C. § 781 et seq.

2. The United States as owner of the USS WHITEHURST is entitled to recover from the M/V HOYANGER, *in rem*, and Westfal-Larsen & Co., A/S, as owner of the M/S HOYANGER, *in personam*, the sum of *$19,570.23.*