HOLLAND–AMERICA LINE, Plaintiff,

v.

M/V JOHS. STOVE, in rem, and Stove Shipping Company, of Oslo, Norway, her owner and operator, Defendants.

LORENTZENS REDERI CO. A/S, as owner of the M/V JOHS. STOVE, Plaintiff,

v.

The M/V KERKEDYK, her engines, etc., and Nederlandsch - Amerikaansche Stoomvaart Maatschappij, N.V. (Holland-America Line), Defendants.

Nos. 66 Civ. 3661, 67 Civ. 4753.

United States District Court
S. D. New York.

June 7, 1968.

Burlingham, Underwood, Wright, White & Lord, New York City, for Holland-America Line (Kenneth Volk and Robert B. Pohl, New York City, of counsel).

Haight, Gardner, Poor & Havens, New York City, for Stove Shipping Co. and Lorentzens Rederi Co. A/S (Richard G. Ashworth and Raymond P. Hayden, New York City, of counsel).

MacMAHON, District Judge.

These admiralty cases arise out of a collision in fog between an upbound freighter and a downbound tanker on the Mifflin Range of the Delaware River, just below Philadelphia. In 66 Civ. 3661, Holland-America claims in rem against the Johs. Stove and in personam against its owner. Lorentzens Rederi Co. A/S appears as claimant. In 67 Civ. 4753, Lorentzens Rederi Co. A/S claims in rem against the Kerkedyk and in personam against its owner, Holland-America Line. The cases were consolidated and tried before this court without a jury on April 10 and 11, 1968.

At the time of the accident, which occurred at 8:09 A.M. on October 28, 1966, Mifflin Range was blanketed by a heavy fog. Visibility was extremely low. The tide was ebbing at one to one and one-half knots. There was no appreciable wind.

The critical factor in these cases is the location of the collision. The Kerkedyk, a freighter, places the collision at the easterly limit of the channel; the Stove, a tanker, places it at the westerly limit. Other factors involved are speeds and courses, lookouts and radar watches.

The Kerkedyk, after turning onto Mifflin Range, steadied on course 057°. The course is 3.5° to the right of the channel course of 0.53.5° for upbound vessels. The ordered course for the Kerkedyk was never less than 057° and, in the minutes before the collision, was changed further to the right to 059° at

8:00 A.M.,[1] then to 061° at 8:04 A.M.,[2] and finally to 065° at 8:07 A.M.[3] This testimony is confirmed by the Kerkedyk's course recorder, as corrected.[4]

The courses steered necessarily placed the Kerkedyk on the far easterly limit (New Jersey side) of the channel at the time of the collision, 8:09 A.M.[5] That fact is established also by the Kerkedyk's pilot, who estimated that at the time of the collision 900 feet of navigable water stretched between his port side and the closest point on the Pennsylvania shore.[6] The Kerkedyk's radar watch officer also fixed the place of collision at more than 900 feet from the nearest point to port.[7]

The Stove, after turning onto Mifflin Range, steadied on course 234°. This course is .5° to the right of the channel course of 233.5° for downbound vessels. The Stove altered its course to the left to 230° at 8:00 A.M. because of the proximity of the shore line on her starboard side,[8] and then still further to the left to 225° at 8:04 A.M.[9] Clearly, these courses were far to the left of the channel course. Despite this, the Stove's master and pilot fixed the place of collision at the westerly limit of the channel, just off the stern of a moored vessel whose port side was adjacent to the westerly limit of the channel.[10] That testimony flies in the face of the physical facts, and we reject it.

The courses steered by the Stove were too far to the left of the channel course and were steered for too long a time to place the collision at the westerly limit of the channel. Had the collision occurred where the Stove places it, the Kerkedyk would have been proceeding upbound alongside the moored vessel. That vessel was manned and prepared to get underway.[11] Yet, no witnesses from that vessel were produced.

We find that the Stove crossed over the center line of the channel and the collision occurred on the easterly limit of the channel.

Article 25 of the Inland Rules, 33 U. S.C. § 210, provides that:

> "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

The Stove did not show that it was unsafe or impracticable to stay to the right side of the channel. It is true that the westerly limit of the channel runs very close to the Pennsylvania shore, but the channel itself was not obstructed in any way. Had the Stove been navigating on her own side of the channel, the collision would not have occurred.

We conclude that the Stove violated Article 25 of the Inland Rules, 33 U.S.C. § 210, by failing to stay to the right side of the channel.

The Stove argues, however, that even if she did cross over, the Kerkedyk was "crowding" her. This contention is based on the geography of the channel. The easterly limit of the channel is flanked by an anchorage, whose width encompasses 1500 feet of navigable water before reaching the New Jersey shore. According to the Stove, the Kerkedyk should have gone further to the right, outside of the channel and into the anchorage.

The anchorage, however, was blanketed by a heavy fog. Vessels were anchored at its northerly and southerly limits.[12] Clearly, it would have been dangerous for the Kerkedyk to steer into, and out of, the anchorage under

1. Trial Transcript (Tr.), p. 26.

2. Tr. 28–29, 117.

3. Tr. 29, 113, 199.

4. Kerkedyk Exhs. 4, 14.

5. Tr. 138, 140.

6. Tr. 31, 64–65.

7. Tr. 175.

8. Tr. 25, 114, 276.

9. Tr. 28, 280–281.

10. Tr. 292, 342.

11. Tr. 293–294.

12. Tr. 18, 22, 108–109, 167, 272, 275.

**72**

such conditions.[13] Moreover, since the Kerkedyk was on the far easterly side of the channel, she could reasonably assume that the Stove had more than enough room to pass port to port with safety.[14] Two conversations between the bridges of the vessels immediately prior to the collision, in which the pilots agreed on a normal port to port passage, reinforced this assumption.[15] The Kerkedyk, "proceeding at moderate speed, was not bound to stop and reverse on the chance that the other vessel might depart from the rules of navigation."[16]

The Stove's pilot testified that in their last conversation he requested the Kerkedyk to hold back.[17] But no one on the Kerkedyk or the Stove could recall such a request.[18] Even the pilot's notes, made shortly after the collision, do not mention a request to hold back.[19]

We find that no conversation between the bridges of the two vessels indicated that the Stove was going to cross the centerline of the channel and that the Stove did not request the Kerkedyk to hold back.

We conclude that the Kerkedyk was not "crowding" the Stove and, under the perilous conditions shown here, had no legal obligation to get out of the way by steering outside of the channel into and out of a crowded anchorage.

There is no merit in the Stove's argument that the Kerkedyk "plowed" into the fog. The Kerkedyk slowed to "slow ahead" at 8:00 A.M. on first sighting the fog bank.[20] On entering the fog bank at 8:03 A.M., she slowed to "dead slow."[21]

We find that the Kerkedyk's speeds were proper and conclude that she entered the fog bank at a moderate speed.[22]

The Stove's speeds can be contrasted with those of the Kerkedyk's. The Stove, in spite of the fog, had her engines set at either "slow ahead" or "stop" from the time of her entry into Mifflin Range.[23] Her engines were set at "slow ahead" from 8:05 A.M. until the time of the collision.

The Stove was in a dense fog in a heavily travelled channel. She should have been proceeding at such speeds as would enable her to stop in one-half of the distance which her lookout could see forward from the bow.[24]

The Stove's master testified that the Stove's bow (about 200 feet away[25]) was visible from the bridge but that he could see nothing beyond it.[26] The Stove should, therefore, have been able to stop in 100 feet, an impossibility given her three to four knot speed. The Stove urges, however, that her three to four knot speed was necessary to maintain steerageway in the ebb tide.[27] Accepting that fact, it is still no defense. When conditions are such as "to require a vessel to exceed the proper speed in a fog to maintain steerageway, that vessel

13. Tr. 81–82.

14. Tr. 80.

15. Tr. 25–26, 28, 275–276.

16. The Victory & The Plymothian, 168 U.S. 410, 426, 18 S.Ct. 149, 42 L.Ed. 519 (1897).

17. Tr. 278–279.

18. Tr. 28, 80, 115–116, 319–320.

19. Tr. 310–312.

20. Tr. 110–111.

21. Tr. 111–112.

22. Villain & Fassio E Compagnia Internazionale Di Genova Societa Riunite Di Navigazione, SPA v. Tank Steamer E. W. Sinclair, 207 F.Supp. 700, 707 (S.D.N.Y. 1962), aff'd, 313 F.2d 722 (2 Cir.), cert. denied 373 U.S. 948, 83 S.Ct. 1678, 10 L. Ed.2d 704 (1963).

23. Stove Exh. H.

24. Skibs A/S Siljestad v. S/S Mathew Luckenbach, 215 F.Supp. 667 (S.D.N.Y.), aff'd 324 F.2d 563 (2 Cir. 1963).

25. Based on the Stove's length of 591 feet and the approximate location of the bridge.

26. Tr. 319.

27. Tr. 304, 314.

should not be underway in the first place." [28]

■ We conclude that the Stove violated Article 16 of the Inland Rules, 33 U.S.C. § 192, by going at an immoderate speed in fog.

The Stove next contends that the Kerkedyk's lookouts should have heard the Stove's fog signals sooner. It is uncontradicted that the Kerkedyk stopped her engines as soon as fog signals were heard.[29] The area of collision, located a short distance from a jetport just downriver from a naval shipyard and in the midst of a number of tank farms, is a noisy one. We cannot say that a proper lookout should have heard the Stove's signals sooner.

Those on board the Stove, however, heard fog signals ahead prior to 8:07 A.M. Her master heard signals ahead for eight to ten minutes prior to collision,[30] her mate for five minutes,[31] and her pilot for four to five minutes.[32] Yet, from 8:05 A.M. until the time of the collision, 8:09 A.M.—four long minutes—the Stove's engines were at "slow ahead."

Article 16 of the Inland Rules, 33 U. S.C. § 192, provides that:

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

■ We conclude that the Stove violated Article 16 of the Inland Rules, 33 U.S.C. § 192, by failing to stop on hearing fog signals forward of her beam.

Finally, the Stove contends that the radar watch on the Kerkedyk was negligent. This contention is based on the Kerkedyk's sighting of the Stove. Presumably, if the Kerkedyk saw the Stove, the Kerkedyk should have gotten out of her way.

The radar watch officer saw the Stove proceeding downriver, parallel to the shore line. The bearing was falling away, indicating that the vessels would safely pass.[33] Then, suddenly, the Stove began to come out from the shore line. The watch officer reported this to the master,[34] but in the narrow channel the Stove crossed over very quickly.[35]

■ We find that there was no negligence in the radar watch. Surely the Kerkedyk could not reasonably foresee that the Stove, proceeding in the fog and aware that the Kerkedyk was proceeding upstream on the opposite side, would suddenly and unexpectedly cross over to the Kerkedyk's side of the channel. In the circumstances, there was nothing which the Kerkedyk could have done to avoid the collision.[36]

One final contrast shows the hopelessness of the Stove's case. The Stove never had a watch officer assigned to radar.[37] Rather, the pilot and the master took turns, but neither saw the Kerkedyk on the radar.[38] As a result, the pilot never suspected the proximity of the Kerkedyk to his vessel but thought that she was one and one-half to two miles away right up to the moment of collision.[39]

28. Avondale Marine Ways, Inc. v. The Crescent Cities, 184 F.Supp. 773, 776 (E. D.La.1960), aff'd per curiam sub nom. National Marine Service, Inc. v. Avondale Marine Ways, Inc., 287 F.2d 889 (5 Cir. 1961). See Afran Transport Co. v. The Bergechief, 274 F.2d 469 (2 Cir. 1960).

29. Tr. 29, 113, 119.

30. Tr. 334.

31. Tr. 367.

32. Tr. 289.

33. Tr. 169.

34. Tr. 170–172.

35. Tr. 123.

36. Cities Service Oil Co. v. M/V Melvin H. Baker, 260 F.Supp. 244 (E.D.Pa.1966), aff'd, 384 F.2d 911 (3 Cir. 1967).

37. Tr. 350.

38. Tr. 322.

39. Tr. 294–295.

But it is hardly likely that the vessels would agree on a port to port passage when they were one and one-half to two miles away. Nor would it be necessary to make the purported request to hold back if the vessels were that far apart. These circumstances should have alerted the Stove's master and pilot that something was wrong with the radar, or their interpretation of it, in view of their duty to check the radar [40] and to use it properly.[41]

We conclude that the Stove had an improper radar watch and that those using her radar were negligent in its operation.

We also conclude that the Kerkedyk violated none of the Inland Rules, 33 U.S.C. § 151 et seq., and that her use of radar and navigation were proper in all respects and in no way negligent. The collision was due solely to the Johs. Stove's violations of the Inland Rules and to her navigational negligence.

Accordingly, M/V Kerkedyk and its owner, Holland-America Line, are entitled to judgment dismissing the claim of Lorentzens Rederi Co. A/S in 67 Civ. 4753. Holland-America Line is entitled to judgment against M/V Johs. Stove and Lorentzens Rederi Co. A/S on the issue of liability in 66 Civ. 3661.

The foregoing constitutes the court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a).

In the pre-trial order, filed October 11, 1967, the parties stipulated to try only the issue of liability, leaving the issue of damages for future determination. The issue and computation of damages will, therefore, be referred to a Special Master. Fed.R.Civ.P. 53(b).

The interlocutory judgment to be entered hereon shall empower and direct the Special Master, to be named by the court, to hear and report, within sixty (60) days, on the damages to the Kerkedyk attributable to the Stove's statutory violations and negligence.

Settle interlocutory judgment on notice within five (5) days in accordance with this memorandum.

So ordered.

---

40. United States v. SS Washington, 241 F. 2d 819 (4 Cir.), cert. denied, Texas Co. v. United States, 355 U.S. 817, 78 S.Ct. 21, 2 L.Ed.2d 34 (1957); British Transport Comm. v. United States, 230 F.2d 139, 142 (4 Cir. 1956), aff'd, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1957).

41. Polarus Steamship Co. v. The T/S Sandefjord, 236 F.2d 270 (2 Cir. 1956), cert. denied, 352 U.S. 982, 77 S.Ct. 383, 1 L.Ed.2d 365 (1957).