417 F.2d 346
 HESS SHIPPING CORPORATION, Plaintiff-Appellee,
v.
The SS CHARLES LYKES, in rem, and Lykes Bros. Steamship Co., Inc., Defendant-Appellant.
LYKES BROS. STEAMSHIP CO., Inc., Plaintiff-Appellant,
v.
HESS SHIPPING CORPORATION and the ST HESS VOYAGER, in rem, Defendant-Appellee.
 No. 26703.
 United States Court of Appeals Fifth Circuit.
 October 10, 1969.
 
 1
 George F. Wood, Mobile, Ala., Benjamin Yancey, Edward S. Bagley, New Orleans, La., George F. Wood, Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., Terriberry, Carroll, Yancey & Farrell, New Orleans, La., of counsel, for appellant.
 
 
 2
 Theodore K. Jackson, Jr., Rae M. Crowe, Mobile, Ala., Armbrecht, Jackson & DeMouy, Mobile, Ala., of counsel, for appellee.
 
 
 3
 Before JOHN R. BROWN, Chief Judge, GODBOLD, Circuit Judge, and CABOT, District Judge.
 
 CABOT, District Judge:
 
 4
 This is an appeal from an interlocutory decree holding Lykes Bros. Steamship Co., the appellant, solely at fault for the collision between its ship, the SS Charles Lykes, and the ST Hess Voyager owned by the Hess Shipping Corp., the appellee. Each party had sued the other and its vessel. The actions were consolidated for a non-jury trial limited to the issue of liability. The appellant Lykes asserts that the findings of fact and the conclusions of law, insofar as the latter relate to Hess's freedom from fault, are clearly erroneous.
 
 
 5
 The facts indicate that on the night of March 3, 1966, in the Upper Reach of Mobile Bay Channel, the outward-bound SS Charles Lykes and the inward-bound Hess Voyager collided at a point adjacent to buoy #42 and, as the lower court found, in the eastern portion of the channel.
 
 
 6
 The channel runs nearly due north and south and is 40 feet in depth for a width of 400 feet. Because the sides of the channel are sloped, it is possible for vessels drawing less than 40 feet to navigate outside the channel boundaries.
 
 
 7
 The collision occurred in a heavy fog which restricted the vessels from visual sightings of each other until they were approximately 300 feet apart. Two buoys are relevant to this discussion. Both are on the eastern side of the channel approximately 150 feet east of the channel boundary line, with buoy #44 being about one nautical mile to the north of buoy #42.
 
 
 8
 On the day of the collision, the Charles Lykes, (a C-2 type cargo vessel, 441 feet long and 63 feet wide, gross tonnage 8,178) departed the Alabama State Dock at about 9:00 P.M. under the control of her master, Capt. Beasley, and pilot, Capt. Walsh. The vessel steamed a course of 154 degrees through the inner harbor of Mobile Bay, also known as Pinto Reach, to its juncture with the Upper Reach which is marked by buoy #44. At this point the vessel was to turn to 182 degrees, the necessary coordinate for an outward-bound vessel. At the time, the pilot of the Charles Lykes was trying to follow the Claiborne, a vessel which had preceded it out of the harbor and which successfully executed the customary port to port pass with the Hess Voyager. However, upon negotiating the turn a problem developed. Although the Charles Lykes was equipped with radar, its unit did not indicate the existence of objects off either the port bow or dead ahead of the vessel. The lower court determined that this failure was caused by the negligent rigging and fixing of cargo booms at a height in excess of and thus in interference with the radar equipment. This interference prevented the Charles Lykes from picking up buoy #44 which resulted in a delay of its turn into the Upper Reach Channel and further prevented it, upon its turn, from either tracking the course of the Claiborne or from picking up the Hess Voyager on its radar. The lower court concluded that because of these difficulties the Charles Lykes ended up in the eastern side of the channel.
 
 
 9
 The Hess Voyager, under her master, Capt. Castro, took on a pilot, Capt. Raley, about 30 miles from the site of the collision. At that point visibility was about four miles. However, fog was encountered when the Voyager reached a point about half way up the channel. Capt. Raley notified the Charles Lykes's pilot of the weather conditions and reduced speed to slow ahead.
 
 
 10
 Throughout this period the radar unit on the Hess Voyager was operating properly and was providing a view of all channel markers and other vessels. The Hess Voyager on at least one subsequent occasion warned the Charles Lykes by radio that the Charles Lykes was too far to the east and would have to move over to effect a safe passing. As the Hess Voyager approached buoy #42 prior to the collision, she was making approximately six knots an hour while stemming an ebb tide of 1½ knots, the wind blowing from the southwest at eight to twelve miles per hour. The Voyager maintained a course on the extreme eastern side of the channel, as the lower court found.
 
 
 11
 By the time both vessels reached buoy #42 and made visual sightings of each other, it was too late to avoid collision. The Charles Lykes went to full ahead and hard right rudder and the Hess Voyager to full astern and hard right. The Hess Voyager went aground just at or immediately after the collision. The vessels collided port to port and the Charles Lykes let out its anchors, finally stopping afloat with her bow facing northwest.
 
 
 12
 The lower court concluded that the Charles Lykes was guilty of gross negligence in rigging her booms in such a way as to greatly impair the effective use of her radar and was grossly at fault in failing to maintain a course on her own starboard side of the channel in violation of Article 25 of the Inland Rules, 33 U.S.C. § 210. It also concluded that any violations on the part of the Hess Voyager of Article 16 of the Inland Rules, 33 U.S.C. § 192, were technical in nature and could not be construed as a contributing cause of the collision.
 
 
 13
 Rule 52(a), Fed.R.Civ.P., applies in admiralty cases and the trial court's findings must be affirmed unless clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20. A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). This is not such a case.
 
 
 14
 Appellant argues that the court erred in failing to conclude that the Hess Voyager was at fault for operating at excessive speed in dense fog, for failing to stop her engines on hearing the fog signal of the Charles Lykes, and for failing to take any steps to avoid the collision. Article 16 of the Inland Rules, 33 U.S.C. § 192, states:
 
 
 15
 Every vessel shall in a fog * * * go at a moderate speed, having careful regard to the existing circumstances and conditions.
 
 
 16
 A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over. [Emphasis added.]
 
 
 17
 The standard of moderate speed as set forth in the statute is necessarily vague. Moderate speed, while less than full speed, is a relative term which depends upon the particular circumstances of each case. Polarus S/S Co. v. T/S Sandefjord, 236 F.2d 270 (2 Cir. 1956). This court long ago recognized that:
 
 
 18
 "Moderate speed" is purely a relative term, which means no more than that the vessel must run at a prudent rate of speed. Time, place, and circumstance, rather than the swiftness of the vessel over her course, determine whether the actual speed was immoderate, in that it was imprudent. Quinette v. Bisso, 136 F. 825, 830, 5 L.R.A.,N.S., 303 (5 Cir. 1905).
 
 
 19
 Under the circumstances of this case the trial court was correct in concluding that the Hess Voyager was not operating at an immoderate speed. The Hess Voyager is a large tanker built in 1964, with a length of 708.2 feet, a beam of 102.4 feet, and gross tonnage of 27,015 tons. The testimony indicated that at full ahead she would make 17 knots and that at slow ahead she would make approximately four knots. The pilot estimated the current at 1½ knots and the speed at five or six knots over the ground. Whether a court recognizes the "Bare Steerage Rule," i. e., that "speed should be reduced to the lowest point consistent with good steerage way" Skibs A/S Siljestad v. S/S Mathew Luckenbach, 215 F.Supp. 667, 679 (S.D.N.Y.1963), or the "Rule of Sight," i. e., "the vessel must proceed at a rate of speed which will allow her to come to a stop within one-half limit of visibility." O/Y Finlayson-Forssa A/B v. Pan Atlantic S/S Corp., 259 F.2d 11, 20 (5 Cir. 1958), both of which are tempered by and subject to analysis under the existing circumstances, Polarus S/S Co. v. T/S Sandefjord, supra, the conclusion is inescapable that because of the great size of the vessel, its length approaching twice the width of the channel, the direction and force of the wind, and its maintaining a course on the extreme eastern portion of the channel, the speed of the Voyager was not immoderate. It was prudent and moderate. The facts support and justify a conclusion that any reduction in speed would have seriously impaired the pilot's ability to control the vessel, which might have resulted in a more serious accident than that which occurred. See, Cities Service Oil Co. v. M/V Melvin H. Baker, 260 F.Supp. 244 (E.D.Pa.1966). A reduction in speed would have been unreasonable and inconsistent with the rules of navigational safety. The district court did not err in concluding that the speed of the Hess Voyager was moderate.
 
 
 20
 Moreover, the district court did not err in concluding that the Hess Voyager did not contribute to the cause of the collision by failing to stop its own engines in violation of § 192.
 
 
 21
 Section 192 contains three prerequisites, all of which must be met before an affirmative duty is placed upon a steam vessel to stop her engines. First, the vessel must hear, apparently forward of her beam, the fog signal of the other vessel. This point is in conflict, but even if a finding is made that the Charles Lykes's signal was heard by the Hess Voyager, the other two conditions must be determined in favor of Hess, as we shall see.
 
 
 22
 The second condition requires that the position of the signaling vessel be unknown. Here the evidence clearly indicates that the Hess Voyager at all times knew the position of the Charles Lykes. In fact, as previously stated, the Hess Voyager on at least two occasions informed the Charles Lykes of her position and requested her to move over to starboard, requests which she acknowledged.
 
 
 23
 As to the third condition, the existing circumstances would not permit the Hess Voyager to stop her engines and then navigate with caution. This is so, for given the size of the Hess Voyager, the width of the channel, and the force and direction of the wind, stopping her engines would in all probability have resulted in her drifting crossways in the channel or partially blocking it, thus increasing the danger to other vessels in the area and the probability of a more serious collision with the Charles Lykes. The wording of the statute is itself a patent recognition that stopping of the engines may be at odds with further "navigation with caution." This case is illustrative of that point. The lower court did not err in its conclusion that the Hess Voyager was without fault with regard to these points.
 
 
 24
 The appellant also attacks as clearly erroneous the trial court's determination of the position of the vessels prior to the collision. Here the appellant relies upon the interpretation of a course recorder which revealed a course which would have placed the Hess Voyager in the western portion of the channel at the time of the collision. However, as one court has so ably said:
 
 
 25
 It [a course recorder] is not an infallible instrument. When considered in light of * * * disinterested witnesses * * * we believe it to be a reasonable inference to conclude that the course recorder did not reflect the true course. Hess Tankship Co. v. SS M. L. Gosney, 230 F.Supp. 1, 6 (E.D.Va.1963).
 
 
 26
 In support of the finding of the trial court that the Hess Voyager was in the eastern portion of the channel, the testimony of several individuals is important. First, there is the testimony of Capt. Staggers of the Claiborne. He testified that when the Hess Voyager passed his vessel the Voyager was on the starboard (eastern) side of the channel, and that when the colliding vessels converged the Charles Lykes was in the center of the channel, or else to the east of the center-line. The record also reflects that upon notice from Capt. Raley, pilot of the Hess Voyager, that the Charles Lykes was in the eastern portion of the channel, Capt. Walsh, pilot of the Charles Lykes reported to Capt. Raley that he was moving over, and the Charles Lykes did change its course, but not far enough to avoid the collision. Finally, here is the objective fact that at or immediately after the moment of impact the Hess Voyager went aground far to the east of the center line of the channel.
 
 
 27
 A review of the entire evidence leaves this court with the definite and firm conviction that the district court did not err in determining that: (1) the Hess Voyager did not violate Article 25 of the Inland Rules, 33 U.S.C. § 210, in that she maintained a course to her own starboard side; (2) any violations of Article 16 of the Inland Rules, 33 U.S.C. § 192, by the Hess Voyager were technical in nature and were not a contributing cause of the collision; (3) the Hess Voyager did not otherwise contribute to the cause of the collision. The judgment of the district court is, therefore, affirmed.
 
 JOHN R. BROWN, Chief Judge (dissenting):
 
 28
 To express strong disagreement with the Court's decision I need not consider the record as I might perhaps read it. I just use the Court's characterization of the facts to demonstrate that Rule 16[1] is now dead in the Fifth Circuit except perhaps those portions which refer to "existing circumstances" or "so far as the circumstances of the case admit." Magnifying these qualifiers the decision obliterates the two mandatory imperatives of Rule 16 — (1) moderate speed and (2) stopping engines. The Court treats it as just a floating intersectional automobile collision in which the fact finder can look back and see what prudent people would have done.
 
 
 29
 But the genius of the Rules for Prevention of Collision is their certainty. Thus, a red light means for one vessel to hold course and speed, the other to give way. In an overtaking the overtaken vessel must hold course and not cross or crowd upon the course of the overtaking ship. In crossing, the vessel having the other vessel on her starboard shall keep out of the way of the privileged ship.
 
 
 30
 But on this opinion navigators will know that breaching the moderate speed Rule-of-sight is a mere technical violation.[2]
 
 
 31
 But it is hardly a technical violation when not only the risk of collision, but collision itself occurred because both vessels continued on ahead, continuously closing the interval between them. A result so plain in fact cannot be glossed over by the metaphysical dialectic of proximate cause.
 
 
 32
 More than that, this was a collision which should never have occurred. Although with defective radar she could not "see" S/T Hess Voyager, the descending S/S Charles Lykes knew of her presence. Worse, as the judge-approved justification for ignoring the second mandate of Rule 16 — stopping engines on hearing fog signal — the Court gives its blessing to a vessel ploughing right on in the fog toward a ship known to be in its path. This is what we say: "The second condition requires that the position of the signaling vessel be unknown. Here the evidence clearly indicates that the Hess Voyager at all times knew the position of the Charles Lykes. In fact, as previously stated, the Hess Voyager on at least two occasions informed the Charles Lykes of her position and requested her to move over to starboard, requests which she acknowledged." p. 350.
 
 
 33
 Earlier, the court phrased it this way: "Throughout this period the radar unit on the Hess Voyager was operating properly and was providing a view of all channel markers and other vessels. The Hess Voyager on at least one subsequent occasion warned the Charles Lykes by radio that the Charles Lykes was too far to the east and would have to move over to effect a safe passing." p. 348.
 
 
 34
 In a restricted channel of 400 feet[3] in "a heavy fog which restricted the vessels from visual sightings of each other until they were approximately 300 feet apart." p. 348, S/T Hess Voyager "was making approximately six knots an hour while stemming an ebb tide of 1½ knots."[4] p. 348.
 
 
 35
 At this speed she was making 600 feet per minute, a distance double that of her visibility and four times the half of visible distance. So gross was this immoderate speed that her knowledgeable counsel did not even undertake to prove, by experiments, tests, expert witnesses, or otherwise just what time it would take from 6 knots ahead to dead stop or the distance S/T Hess Voyager would run in that maneuver. It is plain to everyone who knows anything of vessel operation that she could not stop in one-half a minute — 300 feet — and certainly not in one half the visibility, a quarter of a minute in 150 feet.
 
 
 36
 Considering the size of this vessel, one of the contemporary huge tankers of ever increasing size,[5] to allow such speed, which does not even begin to pay even a deferential bow toward Rule 16, the Court's action is more than to write out Rule 16. It is to give judicial license to bigness, as though the ungainly, awkward nature of these floating boxes relieves them of compliance with any part of the rules except the qualifiers of "special circumstances", "existing circumstances", and the like. And, since on this Court's analysis S/T Hess Voyager could never safely navigate in channels or harbors at a speed less than 6 knots, it means that for her life, she need not pay heed to Rule 16 and its demand for moderate speed which, until today, has always meant capacity to stop in half the distance of visibility. O/Y Finlayson-Forssa A/B v. Pan Atlantic S/S Corp., 5 Cir. 1958, 259 F.2d 11, 20, 1958 A.M.C. 2070, cert. denied, 1959, 361 U.S. 882, 80 S.Ct. 153, 4 L.Ed.2d 119. Nor will she suffer the burden imposed on smaller craft of the rule of The Pennsylvania, 1873, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148, that a violator must establish not only that the breach did not, but could not, have caused the collision. Tempered occasionally by notions of major-minor fault, last clear chance, etc., this stringent demand still prevails, especially, until today, in fog cases. Finlayson-Forssa A/B v. Pan Atlantic S/S Corp., 259 F.2d at 22.
 
 
 37
 It will be interesting to see what we will do with the next fog case in which two ocean going vessels capable from smaller size of reducing speed safely to the Rule-of-sight seek absolution for flagrant breach by incanting our S/T Hess Voyager.[6]
 
 
 
 Notes:
 
 
 [1]
 Article 16 of the Inland Rules, 33 U.S.C. § 192:
 "Every vessel shall in a fog * * * go at a moderate speed, having careful regard to the existing circumstances and conditions.
 A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."
 
 
 [2]
 With obvious approval the Court paraphrases the trial court's conclusion:
 "It also concluded that any violation on the part of the Hess Voyager of Article 16 of the Inland Rules, 33 U.S.C. § 192, were technical in nature and could not be construed as a contributing cause of the collision." p. 349.
 
 
 [3]
 "The channel runs nearly due north and south and is 40 feet in depth for a width of 400 feet. Because the sides of the channel are sloped, it is possible for vessels drawing less than 40 feet to navigate outside the channel boundaries." p. 348
 
 
 [4]
 With each vessel floating and underweigh the tide is irrelevant with respect to the positions of the vessels relative to each other, not fixed objects
 
 
 [5]
 The Hess Voyager is a large tanker built in 1964, with a length of 708.2 feet, a beam of 102.4 feet, and gross tonnage of 27,015 tons
 
 
 [6]
 It is incongruous that Congress, in its then technical ignorance of all modern scientific marvels such as radar and ship-to-ship radio, did not put sole store on signals, ability to see and peremptory commands. The fact is that neither ship was navigating by the Rules. These were junked for radar. And one, with full knowledge of the other's position, charged headlong into certain collision. Compliance with the Rule would have avoided it