**UNION OIL COMPANY OF CALIFOR-NIA, a corporation, Plaintiff-Appellee,**

v.

**The TUGBOAT SAN JACINTO and the BARGE OLIVER J. OLSON III, their engines, boilers, tackle, apparel and furniture, et al., Defendants-Appellants.**

**STAR & CRESCENT TOWBOAT COM-PANY, a corporation, and Oliver J. Olson & Company, a corporation, Cross-Plaintiffs-Appellants,**

v.

**UNION OIL COMPANY OF CALIFOR-NIA, a corporation, and the TANKER SS SANTA MARIA, Cross-Defendants-Appellees.**

No. 25775.

United States Court of Appeals,
Ninth Circuit.

Dec. 2, 1971.

Certiorari Granted Feb. 28, 1972.
See 92 S.Ct. 1177.

Erskine B. Wood (argued), of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendants-appellants.

Kenneth E. Roberts (argued), Ben Lombard, Jr., of Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for plaintiff-appellee.

Before CHAMBERS and WRIGHT, Circuit Judges, and McNICHOLS, District Judge.*

EUGENE A. WRIGHT, Circuit Judge:

The appeal in this admiralty case requires us to consider the continuing vitality of the half-distance rule as the appropriate measure of the statutory command to go at moderate speed in fog. 33 U.S.C. § 192.

On Christmas Eve 1967 a Union Oil Company tanker, the Santa Maria, collided with a lumber barge towed by the tugboat San Jacinto. The vessels were moving in darkness (8:32 p. m.) through mist and fog in the narrow channel of the Columbia River between Waterford Light and Cooper Point, ten miles downstream from Longview, Washington. Both vessels sustained damage, and their owners brought libels and cross-libels in admiralty. The district court, 304 F.Supp. 519, held the tug and barge solely at fault and exonerated the Santa Maria. We reverse, since we have concluded that the fault of both vessels contributed to the collision.

The Santa Maria, fully loaded with 17,000 tons of petroleum products, proceeded upstream toward Portland on the Oregon side of the channel. As the tanker passed Waterford Light those aboard could sight her course ahead for one and a half to two miles through haze and slight drizzle. A thick bank of fog obscured a stretch of water upstream near the Washington shoreline, to the port side of the Santa Maria's planned course. The vessel moved upstream at half speed, seven to eight knots, while nearing the fog bank.

The San Jacinto and its barge proceeded downstream through the low fog hugging the Washington bank, as a passing freighter informed the Santa Maria of the tug's approach. The tanker's pilot first sighted the tug, both visually and by radar, when the San Jacinto was near Cooper Point, on the extreme Washington side of the channel. At that time the vessels were more than a mile apart. The tug then disappeared into the fog, breaking visual contact. The Santa Maria's pilot did not follow the San Jacinto's progress by radar, assuming apparently she would continue on her course along the Washington shore.

Meanwhile, those aboard the tug were unaware of the Santa Maria's approach.

---

* Honorable Ray McNichols, United States District Judge, District of Idaho, sitting by designation.

The San Jacinto's inexperienced crew attempted to feel their way through the fog by watching closely the contours of the adjacent shore, peering through the haze at the Washington bank and playing their radar on it. The district court found the tug at fault for neglecting to keep a proper lookout, failing to sound fog signals, and navigating too rapidly in the thick mist.

The tug crew suddenly glimpsed the range lights of a large ship looming through the fog less than a thousand feet ahead.[1] The lights were off the tug's starboard bow, or so the captain thought, leading him to believe the tanker had veered to the wrong side of the channel. Fearing imminent collision, the tug captain executed a sharp U-turn to his left and attempted to run upstream away from the tanker. The tugboat successfully negotiated the turn, but the heavy lumber barge behind it swung slowly around on its 250-foot line and sideslipped across the channel, striking the Santa Maria's port bow.

The tanker's watch had just resighted the San Jacinto when the tug began its erratic turn. The Santa Maria reacted quickly, putting its engines full astern and blowing danger signals. The barge smashed into the tanker's bow one minute later. Estimates of the Santa Maria's speed at the moment of impact range from three to seven knots.[2]

Evidence at the trial showed the tugboat had become disoriented in the fog and that the Santa Maria had remained well on the Oregon side of the channel. The district court found the tug captain had acted hastily and without sufficient cause in making the sudden turn that pulled the barge into the Santa Maria's path. Had the tug continued downstream the vessels would have passed safely port to port.

Appellants concede the tug's negligence, but seek a ruling of mutual fault. They contend that the tanker's speed while approaching the lateral bank of fog violated long-established rules governing operation under conditions of reduced visibility.

#### I.

■ Article 16 of the Inland Rules, 33 U.S.C. § 192, reads in part:

> Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions.

Although the statute does not define moderate speed, a well-recognized judicial gloss commands that "a vessel shall not proceed in a fog at a speed at which she cannot be stopped dead in the water in one-half the visibility before her." The Silver Palm, 94 F.2d 754, 757 (9th Cir. 1937). This half-distance rule has long had the force of law in this Circuit.[3]

■ The Santa Maria's speed was immoderate as measured by the half-distance rule. The trial court found that the tanker steamed ahead at half speed while approaching the edge of the fog bank. The chief mate testified that at half speed the ship would travel at seven to eight knots.

No more than 900 feet separated the vessels when the Santa Maria first saw the tug emerging from the fog. Although the Union Oil Company presented no evidence about her stopping capability, we think it fair to assume that a fully loaded tanker doing seven to eight knots could not conceivably come to a stop in 450 feet. The Santa Maria was still moving upstream at a speed between three and seven knots when the

---

1. Witnesses estimated the distance at 150 to 300 yards.

2. The pilot thought the speed at impact was six to seven knots. The third mate guessed it was three to four knots.

3. *See, e. g.,* Universal Insurance Co. v. The Coast Banker, 129 F.2d 395 (9th Cir. 1942); The Silver Palm, 94 F.2d 754 (9th Cir. 1937); The Ernest H. Meyer, 84 F.2d 496 (9th Cir. 1936); United States v. Motor Ship Hoyanger, 265 F.Supp. 730 (W.D.Wash.1967); Weyerhaeuser Steamship Co. v. United States, 174 F.Supp. 663 (N.D.Cal.1959).

barge struck her bow. And since the tug had turned back upstream and the barge was swinging across the channel sideways, the Santa Maria before impact had probably covered well over half the distance that initially separated the two vessels.

Appellees argue that the Santa Maria's speed would have allowed it to stop well within the visibility ahead on her own course, which was one and a half to two miles. This observation misses the mark. The relevant distance was no more than 900 feet, the maximum distance separating the vessels when the tug emerged from the fog.

■ A vessel navigating near a fog bank owes the duty of one immersed in fog. The speed and visibility calculations must be performed:

". . . with reference to the distance within which she could be brought to a stop in the water, before *any* course of *any* vessel emerging from the fog on either side would cross her projected course along the fog bank at its nearest point." The Silver Palm, 94 F.2d 754, 767 (9th Cir. 1937) (emphasis in original).

## II.

■ Appellees contend that the Santa Maria's speed was not excessive because she had the San Jacinto in view or on radar at all times. The facts do not support this assertion. The pilot's testimony showed he had not followed the tug's progress on his radar screen, although he did make a radar sighting when the tug was over a mile upstream. The district court found,

"Prior to the collision the SS SANTA MARIA lost visual contact with the tug though she herself was out of the fog. When the SS SANTA MARIA was approaching abeam of Light No. 70 and on the edge of the fog bank, she sighted the Tug SAN JACINTO headed across her bow." 304 F.Supp. 519, 521 (D.Or.1969).

Ignoring this factual inaccuracy for the moment, we read appellees' argument to assert that a vessel operating with radar should be free from the strictures of the half-distance rule. The rule was developed in an earlier day, when speeding through fog was sheer folly, and pilots can now use electronic aids when visibility is limited. But knowledge of another vessel's presence does not solve all problems. Marine collisions continue to occur; at times the images on radar screens lull pilots into a false sense of security and encourage disaster.

If both vessels passing in fog correctly read and interpret their electronic equipment, there is little danger of collision. We must recognize, however, that inevitably men will make mistakes and mechanical aids will fail. Numerous collisions have happened despite radar sightings.[4]

Observance of the rule serves now as an extra safety precaution to avoid collision should a ship's radar malfunction or be misread. That cushion of safety can be vital. We do not think that use of radar removes the need for observance of the half-distance rule.

Even if one knows an oncoming vessel's location, one cannot always be sure the reverse is true. On such inland waters as the Columbia River, it cannot be assumed that an approaching craft has radar equipment and, even if it does, it may have no experienced radar operator.

Safety in fog on the open seas or inland waters requires two-way observa-

4. *See, e. g.,* O/Y Finlayson-Forssa v. Pan Atlantic Steamship Corp., 259 F.2d 11 (5th Cir. 1958) ; Norscott Shipping Co. v. Steamship President Harrison, 308 F.Supp. 1100 (E.D.Pa.1970) ; Holland-America Line v. Motor Vessel Johs. Stove, 286 F.Supp. 69 (S.D.N.Y.1968) ; United States v. Motor Ship Hoyanger, 265 F.Supp. 730 (W.D.Wash.1967) ; Skibs A/S Siljestad v. Steamship Mathew Luckenbach, 215 F.Supp. 667 (S.D.N.Y. 1963) ; Weyerhaeuser Steamship Co. v. United States, 174 F.Supp. 663 (N.D. Cal.1959). All of these decisions invoke the half-distance rule.

tion. There is danger of collision whenever a vessel cannot ascertain the position of another in the vicinity. The half-distance rule demands "defensive driving" and enables one master to escape the consequences of another's negligence or mistake.

### III.

Appellees next argue that speed in violation of the rule may be justified by a need to maintain steerageway in a narrow channel. It is said that a large, heavily loaded ship may have difficulty steering when traveling below a given speed, say five knots, under adverse wind and tide conditions. But we have no evidence that the Santa Maria could not be safely navigated at less than seven to eight knots.[5]

■ Even assuming such a handicap, we do not think the rule should be disregarded by vessels whose bulk necessitates immoderate speed, for a ship should not be underway if she cannot go at a safe speed. The steerageway excuse has been rejected by nearly every court to consider it. See, e. g., Anglo-Saxon Petroleum Co. v. United States, 224 F.2d 86 (2d Cir. 1955); Holland-America Line v. M/V Johs. Stöve, 286 F. Supp. 69 (S.D.N.Y.1968); United States v. Motor Ship Hoyanger, 265 F.Supp. 730 (W.D.Wash.1967).

### IV.

■ Appellees recognize these authorities, but urge us to abandon them and follow the path taken by a recent Fifth Circuit decision, Hess Shipping Co. v. SS Charles Lykes, 417 F.2d 346 (5th Cir. 1969).[6] Hess Shipping rejected the traditional half-distance rule. It declared instead that moderate speed is relative and must vary with the circumstances of each case. Applying this flexible standard, the court held that six knots through dense fog was moderate speed. It reached this startling conclusion by accepting the steerageway justification: "[A]ny reduction in speed would have seriously impaired the pilot's ability to control the vessel . . . ." 417 F.2d at 350. The holding in Hess Shipping appears to mean that any ship too bulky to navigate safely in fog may exercise less caution.

A dissenting judge characterized the Hess Shipping interpretation of Inland Rule 16 thus:

"The Court treats it as just a floating intersectional automobile collision in which the fact finder can look back and see what prudent people would have done." 417 F.2d at 351.

This standard would allow pilots to make individual judgments about what speed is reasonable under the prevailing conditions. The half-distance rule takes that decision from their hands by imposing a formula to fit all circumstances. We are persuaded that the certainty supplied by the half-distance rule is preferable to the ad hoc judgment of a pilot navigating through fog.

Substituting the pilot's on-the-spot decision places too much reliance on individual competence and significantly expands the potential for pilot error.

"Fog rules take into account the uncertainties as this enigma of nature shuts out sound and sight and frequently understanding." O/Y Finlayson-Forssa v. Pan Atlantic Steamship Corp. 259 F.2d 11, 22 (5th Cir. 1958).

Selecting a speed in circumstances of poor visibility necessarily requires a master to balance the risk of accident against commercial pressures for a fast voyage. The half-distance rule comes

---

5. To the contrary, the pilot testified, "You can't slow a loaded ship, any ship, tanker or otherwise, from a full ahead to a slow bell without losing your steering. You have to reduce it slowly. But after you once get the speed off, they handle very good."

6. On rehearing en banc, the Fifth Circuit split seven to seven, so this decision was affirmed by operation of law. 424 F.2d 633 (5th Cir. 1969).

down hard on the side of safety. If we take away the deterrent of the rule marine commerce may move more swiftly, but with more accidents. Even with the rule in force, the exigencies of commerce sometimes push pilots to excessive speeds.

> "The fact that the rule is more honored in the breach than in the observance, merely means that people are usually willing to take chances rather than submit to the galling necessity of poking about in a fog; and, although the usual measure of the care demanded is that commonly used in the calling, that is not the inevitable standard. Common prudence is not always adequate prudence; the courts may and at times do condemn practices that are current in the business." Anglo-Saxon Petroleum Co., Limited of London, England v. United States, 222 F.2d 75 (2d Cir. 1955).

This passage by Judge Learned Hand indicates that even so strong and definite a standard as the half-distance rule has questionable deterrent value. Any lower standard would create a much higher risk of marine tragedy.

■ The Santa Maria violated the statutory command of Inland Rule 16 and the violation is not excused because the fault of the San Jacinto was more flagrant and shocking. The Santa Maria's only chance to escape liability is to prove that her statutory fault could not possibly have contributed to the collision. The Pennsylvania, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1874); The Silver Palm, 94 F.2d 754 (9th Cir. 1938); O/Y Finlayson-Forssa v. Pan Atlantic Steamship Corp., 259 F.2d 11 (5th Cir. 1958). On this record she cannot meet that heavy burden.

Her statutory fault renders the Santa Maria liable for half damages. The judgment of the district court should be modified to hold both vessels at fault, and the damages divided.

Remanded to the district court to ascertain appellants' damages.